UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOISES SERRANO,<br><br>Plaintiff,<br><br>v.<br><br>OPEN ROAD DELIVERY HOLDINGS, INC. D/B/A AMUSE,<br><br>Defendant. | Case No. 2:22-cv-07245-SB-AS<br><br>ORDER DENYING MOTION TO COMPEL ARBITRATION [DKT. NO. 20] |

After receiving numerous unwanted text messages from Defendant Open Road Delivery Holdings, Inc., Plaintiff Moises Serrano filed this putative class action under the Telephone Consumer Protection Act (TCPA). Defendant now moves to compel arbitration, relying on an arbitration provision in the terms and conditions on its website, to which Defendant contends Plaintiff agreed when he signed up for an account. Dkt. No. 20. The Court held a hearing on March 31, 2023. Because the Court finds that Defendant's website did not provide reasonably conspicuous notice that Plaintiff was agreeing to arbitrate his claims, the motion is denied.

I.

Defendant, operating under the name Amuse, runs a cannabis delivery service. Dkt. No. 20-3 at 3. Plaintiff signed up for an account on Defendant's website on August 27, 2020 and subsequently placed multiple orders on the website. Dkt. No. 20-1 ¶¶ 4–5. Plaintiff opened two additional accounts on Defendant's website in July 2021 and November 2021. *Id*. ¶¶ 6–7. At all relevant times, Defendant's webpage to sign up for an account appeared as follows:




*Id*. ¶ 8; Dkt. No. 20-2. Plaintiff clicked on the "Sign Up" button to proceed with creating each of his accounts. Dkt. No. 20-1 ¶ 8. Clicking the "Terms of Use" hyperlink would have directed him to Defendant's Terms of Service, which contained provisions requiring arbitration of claims arising between Defendant and users of its website. *Id*. ¶ 9; Dkt. No. 20-3 at 1, 12. Plaintiff declares—and Defendant does not dispute—that he did not notice the statement at the bottom of the "Sign Up" page when he entered his information on the page and that he did not read the Terms of Service when he created his accounts. Dkt. No. 25-1 ¶¶ 11–12.

On August 28, 2020, the day after he signed up for an account, Plaintiff received a text message from Defendant on his cell phone, which stated: "Amuse: We are now accepting debit card payments! Place your order today and save $10 with promo code DEBIT. . . . Not interested? Reply STOP." Dkt. No. 24 ¶¶ 14–15. Plaintiff alleges that he responded, "Stop" and received a confirmation stating that no further messages would be sent. *Id*. ¶ 16. However, Defendant sent Plaintiff another solicitation by text message from a different number in January 2021, and then continued sending messages despite Plaintiff's repeated requests to opt out. *Id*. ¶¶ 17–19. Plaintiff estimates that, ultimately, Defendant sent him hundreds of text messages, sometimes on a near-daily basis, and almost always from different phone numbers. *Id*. ¶¶ 20–21.

Plaintiff filed this action in October 2022, alleging four causes of action for violation of the TCPA on behalf of three putative classes. Dkt. No. 1. On February 22, 2023, Defendant moved to compel arbitration and to dismiss Plaintiff's first two causes of action for failure to state a claim. Dkt. No. 20. Plaintiff then filed a First Amended Complaint (FAC), again alleging four separate claims under the TCPA. Dkt. No. 24. It is undisputed that the FAC mooted the portion of Defendant's February 22 motion challenging the sufficiency of Plaintiff's pleadings, and Defendant later filed a new motion to dismiss the first two claims in the FAC for failure to state a claim. Dkt. No. 30. That motion is set for hearing on April 21. Meanwhile, Plaintiff opposed the motion to compel arbitration, and Defendant filed a reply. Dkt. Nos. 25, 27.

II.

Under the Federal Arbitration Act, district courts must compel arbitration of claims covered by an enforceable arbitration agreement. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); 9 U.S.C. § 3. The party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). To determine whether the parties have agreed to arbitrate a dispute, federal courts apply state-law principles of contract formation. *Berman*, 30 F.4th at 855. The parties appear to agree that California law governs the contract formation issues in this case. Under California law, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461 (2021) (quoting *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 862 (2016)).

For internet transactions, "in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms." *Id*. Thus, to show that a valid internet contract was formed, "a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." *Id*. The Ninth Circuit has framed this as a two-part inquiry: in the absence of proof that the consumer had actual knowledge of the agreement, an

enforceable internet contract requires that "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856.

In considering the adequacy of online notice, California appellate courts and the Ninth Circuit have repeatedly emphasized that because "online providers have complete control over the design of their websites," *Sellers*, 73 Cal. App. 5th at 465, they bear the responsibility to put users on notice of the terms they intend to enforce. *Berman*, 30 F.4th at 857; *accord Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) ("[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers."); *Long*, 245 Cal. App. 4th at 867 ("Online retailers would be well-advised to include a conspicuous textual notice with their terms of use hyperlinks going forward.").

III.

The issues before the Court are narrow. Defendant does not dispute that Plaintiff lacked actual knowledge of the arbitration provision, and Plaintiff does not dispute that Defendant's Terms of Service contain arbitration provisions that, if Plaintiff agreed to them, require his claims to be arbitrated. The parties disagree only as to (1) whether Defendant's sign-up webpage provided reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms and conditions by creating an account and (2) whether Plaintiff unambiguously manifested his assent to those terms by creating an account. Because the Court concludes that Defendant did not provide reasonably conspicuous notice, it does not reach the second issue.

In considering the enforceability of online arbitration agreements, courts have identified a spectrum of agreement types, ranging from "browsewrap" agreements, in which the website provider assumes assent based on mere use of the website, to "clickwrap" and "scrollwrap" agreements, in which the user is forced to click a box or button expressly stating "I agree" to the terms of use. *Sellers*, 73 Cal. App. 5th at 470. The former typically do not bind consumers, while the latter are generally enforceable. *Id*. The agreement in this case is best characterized as a "sign-in wrap agreement," which the court in *Sellers* explained "fall[s] somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements":

> Sign-in wrap agreements do include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an "I agree" button. Instead, the consumer is purportedly bound by clicking some other button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to "sign in" or "sign up" for an account. Thus, it is not apparent that the consumer is aware that they are agreeing to contractual terms simply by clicking some other button. Instead, the consumer's assent is largely passive, and the existence of a contract turns on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue.

*Id*. at 471 (cleaned up).

The court in *Sellers* considered, as a matter of first impression, whether such sign-in wrap agreements were sufficiently conspicuous to bind consumers. It adopted the conclusion in *Nguyen* and *Long* (which had considered other types of online agreements) that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers" because "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Sellers*, 73 Cal. App. 5th at 476 (cleaned up). The court declined to adopt a bright-line rule, instead explaining that "the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms." *Id*. at 477. In evaluating the agreement before it, the court considered numerous factors including the nature of the transaction; the relative size, font, and color of the text; the visual proximity between the terms and the button the user was to press to proceed; and the fact that the hyperlink to the terms of service was only underlined and not distinguished in any other way. *Id*. at 476–82.

Similarly, the Ninth Circuit in *Berman* explained that to be conspicuous under California law, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." 30 F.4th at 856; *see also id.* at 868 (Baker, J., concurring) ("[I]n the gray zone of sign-in wrap agreements, enforceability requires conspicuous textual notice that completing a transaction or registration signifies consent to the site's terms and conditions. Whether such notice is sufficiently conspicuous will turn on the transactional context, the notice's size relative to other text on the site, the

notice's proximity to the relevant button or box the user must click to complete the transaction or register for the service, and whether the notice's hyperlinks are readily identifiable."). In both cases, the courts found the webpages did not provide sufficiently conspicuous notice to permit an inference that the user had manifested assent to arbitrate. *Sellers*, 73 Cal. App. 5th at 482; *Berman*, 30 F.4th at 857.

Applying *Sellers* and *Berman*, this Court finds that Defendant's "sign up" webpage did not provide reasonably conspicuous notice of the terms and conditions containing the arbitration provisions. As shown above, the page contained four fillable fields for the user to input his or her email address, mobile phone number, and password (twice). Underneath those fields was a purple button with white text stating, "Sign Up." Below that in black underlined text was the line, "Already have an account? Sign in." Finally, below that, smaller and lighter text stated, "By creating an account, you agree to the Amuse Privacy Policy and Terms of Use. You also agree to receive SMS messages related to your account. Standard message and data rates apply."

"[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. Here, the text stating that the user agrees to Defendant's terms of use is in a smaller font than both the "Sign Up" button and the line for account-holders to sign in. The lighter font of the notice language also blends into the white background more than the darker writing above it, drawing attention away from it. *See id*. at 857 ("The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text."). The fact that the notice language is not immediately adjacent to the "Sign Up" button, but rather separated by larger and darker text addressing users with existing accounts, further detracts from its conspicuousness. *See Sellers*, 73 Cal. App. 5th at 479 (finding insufficient (1) notice that was not "in larger type than the surrounding text," "in contrasting type, font, or color to the surrounding text of the same size," or in "visual proximity . . . to the request for consent" and (2) notice "at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page").

To be sure, the notice language here is not quite as miniscule as in *Berman* and *Sellers*, and the rest of the webpage contains fewer colorful distractions. But

the notice language at the bottom of the page is still the least conspicuous part of the webpage, and nothing in the webpage draws the viewer's attention to it. Moreover, the failure to identify the hyperlink to Defendant's Terms of Use by more than mere underlining is highly significant under *Berman*. As the Ninth Circuit explained, when the terms and conditions to which a user is asked to agree are accessed through a hyperlink, "the design of the hyperlinks must put such a user on notice of their existence," and "[a] web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text." *Berman*, 30 F.4th at 857 (citing *Sellers*, 73 Cal. App. 5th at 481). Instead, hyperlinks are typically designated by "the use of a contrasting font color (typically blue) [or] the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id*.[1] Neither was done here. Thus, as in *Berman*, "[t]he failure to clearly denote the hyperlinks here fails [the] conspicuousness test." *Id*.

Defendant argues that the transactional context—one of the factors identified in *Sellers*—weighs in favor of enforcement of the agreement because Plaintiff signed up for an ongoing account rather than making a one-time purchase. *Sellers* explained that its concern about consumers being expected to "ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound" was heightened "when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship." 73 Cal. App. 5th at 476; *see also id*. ("[I]t is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them."). *Sellers* did not, however, suggest that a more enduring commercial relationship relieves the website owner of its obligation to provide conspicuous notice of arbitration provisions. Rather, the nature of the transaction is merely one part of the context that courts must consider in determining whether the notice is conspicuous. Defendant, who bears the burden of establishing an agreement to arbitrate, has provided scant information

---

[1] Defendant relies on *Pizarro v. QuinStreet, Inc.*, No. 22-CV-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022), which found that an underlined hyperlink was adequately conspicuous even though it was the same color as the textual notice. *Pizarro* cited *Berman* but did not address the Ninth Circuit's statement that the notice "must do more than simply underscore the hyperlinked text." *Berman*, of course, is binding precedent, while *Pizarro* is not.

about the nature of the parties' relationship or what typical consumers would expect when signing up for an account with Defendant. Moreover, it asserts that Plaintiff in 2020 and 2021 created three accounts and made a total of two orders—less than one order per account. It is not clear on this record that Plaintiff should have expected to be bound by an arbitration agreement based on the nature of the account for which he signed up. Nor has Defendant shown that the context renders its otherwise inconspicuous notice sufficient under *Berman* and *Sellers*.

In sum, Defendant has not shown that the small, lighter-colored text on its webpage stating that Plaintiff agreed to its terms of use by creating an account was sufficiently conspicuous to support a finding that Plaintiff assented to those terms by clicking the "Sign Up" button when he created his account. Accordingly, Defendant has not established that Plaintiff agreed to arbitrate his claims in this case.

## IV.

In *Sellers*, the California Court of Appeal observed that federal courts' reliance upon "subjective criteria" when evaluating the enforceability of sign-in wrap agreements has produced inconsistent results. 73 Cal. App. 5th at 472. This is a fair observation, but it is the predictable outcome of the failure to adopt a bright-line rule that would provide a greater measure of certainty for consumers and business owners alike. The *Sellers* court recognized this point but understandably deferred such rulemaking to the body that is in the rulemaking business—the California Legislature. In the meantime, business owners should recognize that if they come to court seeking to enforce the arbitration terms set forth in a sign-in wrap agreement, they bear the burden of proving contract formation under California law. While businesses often face difficult challenges, directing a web designer to provide conspicuous notice that a consumer will be bound by contract terms by pressing a sign-up button is not one of them. Where, as here, a business has failed to take simple steps to call attention to the agreed-upon terms, it cannot expect to enforce an arbitration agreement under California and Ninth Circuit law. Because Defendant has not shown the existence of a valid agreement to arbitrate Plaintiff's claims, its motion to compel arbitration is DENIED.

Date: March 31, 2023

Stanley Blumenfeld, Jr.
United States District Judge